# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

WILLIAM JACKSON,

      Plaintiff,

      v.

THE STANDARD FIRE INSURANCE
COMPANY,

      Defendant.

Civil Action No. TDC-17-1612

## MEMORANDUM OPINION

On October 4, 2014, Plaintiff William Jackson returned home from a month-long trip to discover that a malfunctioning toilet had caused thousands of gallons of water to flow throughout his house, causing significant water and mold damage, which to this day has not been fully remediated. After submitting a claim to his insurance company, Defendant The Standard Fire Insurance Company ("Travelers"), a dispute ensued over whether and to what extent the water and mold damage should be covered by the Policy. Unable to reach an agreement on the proper interpretation of the Policy's mold limitation and subsequent coverage of Jackson's damages, Jackson filed suit against Travelers.

Presently pending is Travelers' Motion for Summary Judgment. A hearing was held on this Motion on June 25, 2019. For the reasons set forth below, Travelers' Motion for Summary Judgment is DENIED.

# BACKGROUND

## I.     The Policy

As of October 4, 2014, Jackson had a homeowner's insurance policy ("the Policy") from Travelers to provide insurance on his home located in Fort Washington, Maryland ("the House"). The Policy, which had been renewed effective January 12, 2014, generally covered "direct physical loss to the property." Joint Record ("J.R.") 30. Specifically, it provided $378,000 of coverage for the House, $264,600 of coverage for Jackson's personal property, and $113,400 of coverage for loss of use of the House. Travelers acknowledges that water damage to the House from a toilet malfunction is a covered loss under the Policy, subject to various exclusions and limitations.

As to exclusions, the Policy contains a list of "excluded perils" which are subject to the Policy's Anti-Concurrent Causation ("ACC") Clause, which states:

> We do not cover any direct or indirect loss or damage caused by, resulting from, contributing to or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause of event contributing concurrently or in any sequence to the loss.

J.R. 13. This provision applies whether or not the loss event: "(1) Results in widespread damage; (2) Affects a substantial area; or (3) Occurs gradually or suddenly." *Id.*

Mold is not listed among the original list of exclusions subject to the ACC Clause. However, the Policy contains an endorsement relating to mold ("the Mold Endorsement") that adds an exclusion for:

> "Fungi," Other Microbes or Rot, meaning any loss or cost resulting from, arising out of, caused by, consisting of, or related to, "fungi," other microbes or rot. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

J.R. 47. The Mold Endorsement also provides a form of "Additional Coverage" for "Limited 'Fungi,' Other Microbes or Rot Remediation" (the "Mold Limitation"). The Mold Limitation provides up to $5,000 of coverage for mold remediation as follows:

> If a loss caused by a Peril Insured Against under Section I results in "fungi", other microbes or rot, [Travelers] will pay for:
> (1)    Remediation of the "fungi," other microbes or rot. This includes payment for the reasonable and necessary cost to:
>     (a) Remove the "fungi," other microbes or rot from covered property or to repair, restore or replace that property; and
>     (b) Tear out and replace any part of the building as needed to gain access to the "fungi," other microbes or rot;
> (2)    Any reasonable and necessary increase in living expense you incur so that your household can maintain its normal standard of living or loss of fair rental value if the "fungi," other microbes or rot makes the "residence premises" not fit to live in. We do not cover loss or expense due to cancellation of a lease agreement; and
> (3)    Any reasonable and necessary testing or monitoring of air or property to confirm the absence, presence or level of the "fungi," other microbes or rot, whether performed prior to, during or after removal, repair, restoration or replacement.

J.R. 47.

## II.    The Insurance Claim

On October 5, 2014, after being away on business for approximately one month, Jackson returned to the House and discovered significant damage. While Jackson was away, thousands of gallons of water flowed through the House after a toilet on the main level malfunctioned. As Jackson walked through the House that day, hearing the water under his feet with each step, he noted that the walls were sweaty because of humidity from the flood, floors were buckled, the basement ceiling had collapsed, and the basement was extremely saturated. Mold was present in various places on various items in the basement and throughout the House.

Jackson tried to dry the interior of the House and his personal property using fans and towels. Jackson reported the damage to his insurer, Travelers, which conducted an initial site visit

and inspection the next morning, October 6, 2014. During this visit, Travelers advised Jackson of the $5,000 Mold Limitation in the Policy.

After Travelers provided Jackson with a list of cleaning companies to perform initial water and mold mitigation, Jackson advised Travelers that he wanted a hygienist to inspect the property. On October 16, 2014, Travelers then told Jackson to hold off on hiring a mitigation company and instead provided him a list of two industrial hygienists that could provide a protocol for mold remediation. On October 22, 2014, during another site inspection, Travelers issued a $3,000 advance on the Mold Limitation to cover the mold testing and remediation, $750 for temporary housing, and $1,500 as a security deposit advance.

Jackson opted to hire a company not identified on Travelers' list, EFI Global, Inc., as he was entitled to do, which then conducted a "limited moisture investigation" on October 20, 2014. J.R. 281. The EFI report described visible water and mold damage on the main level and basement level. Specifically, most damage on the main level was in the master bedroom, where the defective toilet was located, including visible mold on lower portions of furniture and footwear in the master bedroom. The majority of the damage was in the basement, where the ceiling and some walls had collapsed and mold was visible "on just about every piece of furniture, fabric, and contents." J.R. 282.

Although Travelers had told Jackson that a mold test was needed, EFI only took moisture readings, leading Travelers to notify Jackson that it would hire a hygienist to more fully inspect the home. Travelers hired Environmental Solutions, Inc. ("ESI"), which conducted its inspection of the House on November 12, 2014 and provided a report with the results of mold tests. ESI reached a similar conclusion to that of EFI and found that most of the basement was affected by water damage and subsequent fungal growth.

On December 3, 2014, Travelers notified Jackson that Rolyn Estimates ("Rolyn") would be contacting him to schedule times to inspect the home to prepare certain cost estimates. Travelers tasked Rolyn with preparing three estimates—one for the cost of emergency water mitigation services, one for the cost of damages caused by water, and one for the cost of damages caused by mold. Eric Huzzy from Rolyn contacted Jackson and visited the House on December 8, 2014 to conduct an inspection and prepare the estimates.

On December 19, 2014, Travelers informed Jackson that South River Restoration ("SRR") would be scheduling a visit. Travelers had asked SRR to prepare estimates on the costs to pack, store, and return the salvageable contents of the House, to clean the House, and to replace damaged contents. When SRR personnel attempted to conduct its inspection on December 29, 2014, Jackson refused to allow them to enter. Travelers told Jackson that he had a duty under the Policy to allow Travelers and its contractors to view the premises and continued to request permission to enter. While he was refusing entry to SRR, Jackson retained a different company, 2J Enterprises, LLC, to compile an inventory of the contents of the House, which it prepared from photographs and handwritten notations provided by Jackson. Jackson's inventory estimated that replacing the damaged contents would cost $102,240.

On January 14, 2015, Jackson informed Travelers that he would not allow its personnel or contractors to enter the House until his forthcoming complaint with the Maryland Insurance Administration ("MIA") was addressed. On January 19, 2015, Jackson filed a Complaint with the MIA, alleging a failure by Travelers to "process [his] claim in good faith," a "waste of policy resources," a failure to permit Jackson to select his own contractors in accordance with Maryland regulations and law, and "harassment." MIA Compl. at 2, ECF No. 19-5.

On January 20, 2015, Travelers notified Jackson that it had received Rolyn's initial estimate and needed to verify it for accuracy through an inspection of the House, but it received no reply. On March 13, 2015, Jackson notified Travelers that he would allow its representatives to enter the House. The parties had difficulty reaching agreement on a date and time for a visit by SRR, but eventually SRR inspected the House on April 17, 2015 and prepared its estimates. On May 21, 2015, Travelers issued to Jackson three checks based on the Rolyn estimate: one for mold remediation, including the cleaning, testing, and monitoring of mold, in the amount of $2,000, the remainder of the $5,000 mold limit; one for the cost of water mitigation services in the aftermath of the loss, such as drying out the affected areas, in the amount of $10,409.58; and one for the cost of repairing and rebuilding the structure to address the water damage, in the amount of $21,899.45. By August 31, 2015, Travelers had made additional payments based on the SRR estimates, in the form of a check for $13,770.44, to cover the cost of packing out, storing, and returning salvageable contents, and another check for $11,385.62, representing the value of contents destroyed by water damage. Although SRR estimated the value of items damaged by mold as $53,458.69 and the cost of cleaning the House as $10,671.85, Travelers deemed those expenses to be subject to the $5,000 Mold Limitation and thus did not provide any additional payout.

In mid-2016, Jackson hired Edwin Cameron of Atlantic Estimating, LLC to perform an inspection and create a new estimate based on observed damage and EFI's report. On June 24, 2016, Cameron conducted his inspection, during which he identified visible water and mold damage. However, because he was not directed to prepare an estimate differentiating between water and mold damages, Cameron prepared only an estimate of costs caused by water damage. In his estimate, Cameron did not include the cost of damage on the main floor above the level of the toilet and flood water line and called for demolition and replacement of the drywall on the

6

main level only up to four feet above the floor. The estimate for the basement repairs was far more extensive, calling for nearly wholesale demolition and repair of ceilings and walls. In total, Cameron estimated $184,164.26 in water-related building damages.

After closing out the claim in its system, Travelers agreed to re-inspect the House on November 10, 2016 with Cameron and Huzzy present. It was determined, based on the re-inspection, the ESI report, and collaboration between Cameron and Huzzy, that some costs were not actually subject to the Mold Limitation, resulting in two revised Rolyn estimates, on November 21, 2016 and December 13, 2016. On January 5, 2017, in accordance with the revised estimates, Travelers issued its final two payments to Jackson to date: one for $13,803.13, the additional cost for repair and rebuilding of the structure, and one for $1,120.24, the additional cost for water mitigation services. To date, Travelers has paid Jackson $110,138.46 in total, including for water mitigation services and repair and rebuild of the damaged structure ($47,232.40), water-damaged contents ($25,156.06), mold remediation ($5,000), and living expenses ($32,750).

Near the end of 2017, Jackson retained two water and mold remediation experts, William Begal and Anabel Fink of Begal Enterprises, to conduct their own analysis of the House and the prior reports and estimates. Begal and Fink inspected the House in January 2018 and observed evidence of significant water damage and the presence of mold. Begal and Fink assessed whether particular items were "damaged by the water or by the mold" and created a report listing only damages caused by water damage, as directed, opting not to itemize any damages caused by mold. J.R. 664. Although they did not provide a full estimate of costs, Begal and Fink did identify some items on SRR's list of contents damaged by mold, valued at $1,201.17, that they concluded "could have been salvaged had [Travelers] extended coverage under [the] water damage portion" of the Policy and not the Mold Limitation. J.R. 1186.

7

Finally, in February 2018, Travelers hired its own expert in water and mold remediation, Clifford Merritt of Merritt Adjusting, LLC to review the existing reports and estimates. Merritt reviewed the Policy, the Rolyn estimate, the SRR estimate, the report by Begal and Fink, and some of Travelers' log notes and concluded that mold damage found above the water line is subject to the Mold Limitation but damage to the drywall below the water line is covered by the Policy because it lost its structural integrity based only on the water damage, where it was "just consequential that it had mold on it." J.R. 955.

III.    **Procedural History**

On April 26, 2017, Jackson filed his Complaint against Travelers in the Circuit Court of Maryland for Prince George's County, alleging breach of contract, asserting a claim of failure to settle an insurance claim in good faith, in violation of Section 3-1701 of the Courts and Judicial Proceedings Article of the Maryland Code, and seeking a declaratory judgment that the Policy covered certain losses for which he had yet to receive payment. Travelers removed the case to this Court. After the denial of its Motion for Partial Dismissal and the completion of discovery, Travelers filed the pending Motion for Summary Judgment.

**DISCUSSION**

In its Motion, Travelers seeks summary judgment on the grounds that (1) the ACC Clause precludes any coverage for loss relating to mold that exceeds the $5,000 Mold Limitation; (2) Jackson has not established a genuine issue of material fact to dispute Travelers' valuation of his loss; (3) Jackson failed to comply with requirements of the Policy to mitigate damages and to permit Travelers to take actions to process his claim; and (4) the evidence does not support Jackson's claim of lack of good faith.

# I. Legal Standards

## A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## B. Contract Interpretation

For insurance claims in Maryland, the burden of proving that coverage exists falls on the policyholder. *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 66 A.3d 615, 624 (Md. 2013). If coverage is established, the insurer then bears the burden of proving that a certain claimed loss falls within a policy exclusion. *Id.* Because "exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage." *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002) (quoting Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance, 2d* 281 (Eric Mills Holmes ed., vol. 2 § 7.2, West 1996)).

For the interpretation of insurance policies for purposes of insurance coverage disputes, rather than construing such policies against the insurer, Maryland applies the more general rule of contract interpretation "that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole." *Kendall v. Nationwide Ins. Co.*, 702 A.2d 767, 771 (Md. 1997) (quoting *Cheney v. Bell Nat'l Life*, 556 A.2d 1135, 1138 (Md. 1989)). "The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Slice v. Carozza Props. Inc.*, 137 A.2d 687, 693 (Md. 1958)). Thus, "a contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." *Id.* A court must therefore seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.*

In interpreting contract language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at 232-33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).

## II. The ACC Clause

In its Motion, Travelers argues that the Policy's ACC Clause excludes any additional recovery by Jackson because any remaining unreimbursed losses consist of damage "caused by, resulting from, contributing to, or aggravated by" mold and it has already paid out the maximum of $5,000 in mold-related damages pursuant to the Policy's Mold Limitation. J.R. 13.

Jackson argues that the ACC Clause is not enforceable because (1) he did not receive proper notice of the inclusion of such a provision, as required by section 19-215 of the Insurance Article of the Maryland Code; and (2) even if the ACC Clause applies, it is not properly interpreted to exclude coverage over any property on which mold has appeared.

### A. Enforceability of the ACC Clause

Jackson first argues that the ACC Clause is unenforceable because Travelers failed to provide him with notice of the inclusion of that clause in the Policy, as required by Maryland law. Travelers asserts that it provided the required notice and, in any event, because the statute does not create a private right of action, Jackson cannot invoke that provision to invalidate the ACC Clause.

In 2013, Maryland enacted a requirement that when issuing a homeowner's insurance policy that includes an anti-concurrent causation clause, an insurer must provide the policyholder each year with a "clear and specific" notice that "describes the ACC clause," "informs the insured to read the policy for complete information on the exclusions," and "states that the insured should communicate with the insurance producer or the insurer for additional information regarding the scope of the exclusions." Md. Code Ann., Ins. § 19-215(a) (West 2014). During discovery, Jackson requested that Travelers produce "any and all notices" regarding the ACC Clause that were sent to Jackson. J.R. 1090. In response, Travelers produced three notices, relating to the policies effective beginning in January 2015, 2016, and 2017, but it did not produce any notice

relating to the policy effective January 12, 2014, which governs this dispute. Because Travelers has failed to produce a notice applicable to the Policy, the Court finds that Travelers failed to comply with the notice requirement of section 19-215(a).

Despite Travelers' non-compliance, Jackson cannot invoke the notice requirement to void the ACC Clause. Notably, other similar Maryland statutes requiring the provision of a particular notice or disclaimer prior to contracting specifically detail the consequences for failing to comply with that requirement. *See, e.g.*, *Romm v. Flax*, 668 A.2d 1, 2-3 (Md. 1995) (interpreting a statute requiring the seller in a real estate transaction to provide the buyer with a disclosure statement that stated that the "[e]ffect of failure to deliver" such a statement would be that "the contract is void"). Here, section 215(a) not only lacks a provision stating that a failure to provide the required notice renders the clause void, but it contains a provision stating that "notice under subsection (a) of this section . . . does not create a private right of action." Md. Code Ann., Ins. § 19-215(b). Where Jackson seeks to invoke the notice provision as part of a civil action he filed against Travelers, the Court finds that the lack of a private right of action precludes the Court from voiding the ACC Clause based on lack of notice. Rather, where the only language in the statute relating to a remedy states that "[t]he Commissioner may adopt regulations to implement this section," Md. Code Ann., Ins. § 19-215(d), the remedy appears to be limited to whatever enforcement regime is established administratively, not enforcement through a private civil action. Accordingly, the Court finds that Jackson cannot invalidate the ACC Clause based on lack of notice and is therefore bound by its terms.

## B.    Interpretation of the ACC Clause

With the ACC Clause enforceable, Travelers argues that it operates to exclude any coverage for Jackson's loss because the entirety of the damage, or at least of the damage that has

yet to be reimbursed, is covered by the language of the ACC Clause. Because coverage is excluded, Travelers contends, summary judgment should be granted.

At the outset, the ACC Clause must be viewed in context within the overall Policy. The Policy generally provides coverage for "direct physical loss to the property." J.R. 30. The parties agree that Jackson's loss was initially caused by water damage resulting from the toilet malfunction, and that the water damage, coupled with significant humidity in the weeks following the toilet malfunction, led to the growth of mold. Under the doctrine of efficient proximate causation, because the toilet malfunction was the dominant cause of all of the damage in that it began a chain of events that proximately led to both the water and mold damage, the entire loss would be covered. *See Aragona v. St. Paul Fire & Marine Ins. Co.*, 378 A.2d 1346, 1350 (Md. 1977).

However, Travelers argues that the entirety of the loss is subject to the exclusion stated in the ACC Clause, which states that:

> [Travelers] do[es] not cover any direct or indirect loss or damage caused by, resulting from, contributing to, or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

J.R. 13. The Mold Endorsement added mold as an exclusion subject to the ACC Clause, by including the following parallel exclusion provision:

> **"Fungi," Other Microbes or Rot**, meaning any loss or cost resulting from, arising out of, caused by, consisting of, or related to, "fungi," other microbes or rot. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

J.R. 47.

Travelers argues that the plain language of these provisions operates to exclude from coverage the entirety of Jackson's loss. While acknowledging that all of the damage, as a matter

of causation, arose from the initial covered event of the toilet malfunction, Travelers asserts that as a result of the pervasive mold throughout Jackson's house that has caused additional damage, all of the loss for which Jackson seeks additional coverage is appropriately characterized as loss that "consist[s] of" or is "related to" mold and is thus excluded under the ACC Clause. Mot. Summ. J. at 9, ECF No. 71-3. Jackson rejects such a broad reading of the ACC Clause, asserting that Travelers seeks a "one spore" rule, under which coverage would be excluded for any damaged item containing a single spore of mold, even when the loss was plainly the result of the water damage. Although at the hearing Travelers disavowed a "one spore" rule, it maintains that under the facts of this case, the entirety of what Jackson seeks in additional coverage is excluded from general coverage by this clause, and is covered only by the Mold Limitation.

Although the ACC Clause appears broad and sweeping in its exclusion of mold damage, the Court does not agree that as applied to Jackson's loss, its terms dictate the result sought by Travelers. Certainly, the specific mold that has grown on individual items or portions of the House, and the cost of removing or remediating that mold, is excluded because the mold consists of, relates to, or results from fungi. But the terms do not require a finding that an item that was plainly and obviously damaged beyond repair by the flow of water through the House, such as a wooden chair that permanently lost its structural integrity because of the water damage, is excluded from coverage just because mold later began to grow upon it. If the chair could be deemed to have been damaged beyond repair, and thus a total loss, before the onset of the mold, a careful reading of the ACC Clause would support the conclusion that the loss of the chair did not actually "result[] from" the mold, did not "aris[e] from" the mold, was not "caused by" the mold, did not "consist[] of" mold, and was not "related to" the mold, since the mold played no role in the destruction of the item. J.R. 47. Where the item was a total loss as a result of the water damage, it could also be

14

fairly determined that the mold did not actually "contribut[e] to" the loss, and that the loss was not "aggravated by" the mold. J.R. 13. Although the ACC Clause also excludes a loss if another cause or event "contribute[d] concurrently or in any sequence to the loss," and thus is not automatically inapplicable just because the water damage occurred before the onset of mold, this provision would only exclude coverage of the damaged chair if some part of the loss actually resulted from, arose out of, was caused by, consisted of, or related to the mold, such that it relates back to the same analysis. J.R. 47. Thus, while the ACC Clause would exclude coverage of a damaged item if the mold contributed in any way to the need to replace the item, or even if it was not discernible whether mold so contributed, it would not operate to exclude coverage from an item for which it could be determined that the item was a total loss from the initial water damage alone, regardless of whether one or more spores of mold later grew upon it, since that mold that played no part in the need to replace the item.

This reading is consistent with the principles underlying interpretations of ACC clauses as set forth in case law. The classic example of a loss caused concurrently by a covered and excluded peril occurs when a storm causes both flood damage, which is typically excluded from standard insurance policies, and another form of damage. For example, in *Front Row Theatre v. American Manufacturer's Mutual Insurance Companies* 18 F.3d 1343, 1345, 1348-49 (6th Cir. 1994), a theater had extensive water damage to its carpeting when during a storm, a partially blocked storm drain system overflowed and discharged water back into the theater's driveway and into the theater, but there was also water that flowed into the theater directly from the street that never entered the storm drains. *Id.* at 1345. Although water damage from the blocked storm drain would have been covered under the insurance policy, damage from surface water flooding was not. *Id.* Where the court found that the damage to the theater's carpeting was caused by both the storm

drain water and the flood water in combination, and not solely by one or the other, the ACC clause excluding coverage for flood damage "regardless of any other cause or event that contributes concurrently or in any sequence to the loss" operated to bar coverage entirely because the flooding "was a contributory cause." *Id.* at 1347-49.

In another example, *Leonard v. Nationwide Mutual Insurance Company*, 499 F.3d 419 (5th Cir. 2007), Hurricane Katrina caused damage to the policyholder's home by bringing winds that damaged the roof, garage doors, and windows and a tidal surge that flooded the ground floor. *Id.* at 426. The policy covered wind damage, but not flood damage, and contained an ACC clause. *Id.* at 424-25. The court held that there could be three discrete categories of damage: "damage caused exclusively by wind; (2) damage caused exclusively by water; and (3) damage caused by wind 'concurrently or in any sequence' with water." *Id.* at 430. Only the damage caused exclusively by wind was covered. *Id.* Rejecting the notion that the ACC clause required that the presence of any floodwater in the house would preclude any coverage for wind damage, the court held that where the evidence permitted a finding that certain damages were caused only by wind, those damages were covered by the policy. *Id.* at 430-31. The ACC clause served to bar only those damages where the "wind and water synergistically caused the same damage." *Id.* at 430.

Thus, the case law supports the Court's interpretation of the ACC Clause that while it will exclude coverage from the loss of items where both water and mold "synergistically" caused the loss, it will not exclude coverage for losses that were caused by water "exclusively." *Id.* Here, this case lies somewhere between *Front Row Theatre*, where the storm drain water and flood water were identical in form and occurred so simultaneously that it would be impossible to identify any loss exclusively caused by one, 18 F.3d at 1348, and *Leonard*, where the wind and flood damage appeared differently and affected different items and parts of the house, such that it was readily

discernible that some damage was exclusively caused by wind, 499 F.3d at 426. Although the water damage and mold damage at the House may have affected some of the same items or parts of the House, they were not so overlapping, or so identical in form as storm drain water and flood water, that the question of exclusive causation cannot be assessed. Indeed, Travelers' own adjusters undertook such an analysis and made specific determinations that the loss of certain items was caused exclusively by water damage.

Rather than applying a "one spore rule" under which Travelers would claim that the presence of any mold would exclude coverage under the ACC Clause, Huzzy, who conducted the Rolyn estimates commissioned by Travelers, effectively applied a standard consistent with the Court's interpretation of the ACC Clause. Huzzy described Travelers' protocol as having three stages. First, Huzzy considered the work needed to stem the spread of water damage and dry out the affected area, thereby preventing further loss. The costs for these actions were classified as emergency and water remediation services, all of which would be covered under the Policy, and were listed in the first estimate. Second, Huzzy made an evaluation of the materials and contents that were not salvageable. For example, as to drywall, he asked: "Has the gypsum core separated from the paper? Is it structurally compromised?" J.R. 824. If compromised in this way, it would need to be replaced. These costs would fall in the second estimate, for water damage repair and rebuilding costs. Finally, the third estimate was for mold remediation and repair, which "would be what's left after I've pulled out everything that's wet" and structurally compromised because of water. J.R. 829. Under this process, Huzzy classified certain items as a total loss due to water damage, such as drywall that lost its structural integrity due to water, regardless of any mold growth.

This process was consistent with the protocol described by Vincent Gigliotti, the ESI hygienist, and Clifford Merritt of Merritt Adjusting, LLC, Travelers' water and mold remediation expert. Gigliotti stated that drywall that was wet longer than 72 hours generally is not salvageable and therefore must be removed regardless of the presence mold, such that the cost would be covered under the Policy. Merritt, having reviewed the Policy, likewise stated that his classification of damages related to the structure and composition of the materials when dried out. If "the drywall is wet and it's four foot high and there's mold around all of that drywall, the drywall has to be torn out because it was wet. It's just consequential that it had mold on it. It wouldn't change the outcome." J.R. 955. However, if the studs behind the drywall have mold growth, and after drying out they return to their pre-loss structural condition, then the cost to remediate that mold would not be covered. Thus, Travelers' approach generally was to provide coverage for items where the loss was exclusively caused by water damage, but not for those where the loss and need for repair was in part caused by mold.

Accordingly, the Court finds that the ACC Clause does not entirely bar Jackson's losses. Although it excludes coverage for damage to any items for which mold contributed to the loss, even if to a lesser degree than water, it does not exclude coverage for the loss of items where the evidence establishes that it was irreparably damaged exclusively by the initial water damage and was a total loss regardless of any subsequent mold growth. Because the ACC Clause does not automatically exclude all of Jackson's remaining alleged loss, summary judgment on the basis of the language of this clause is not warranted.

The Court notes that any loss caused by mold, whether exclusively or concurrently, would be eligible for coverage under the Mold Limitation, which provides up to $5,000 of coverage for mold-related damages when a peril covered by the Policy "*results in* 'fungi,' other microbes or

18

rot." J.R. 46 (emphasis added). Specifically, this provision covers: (1) remediation of mold, including removing it from covered property, repairing, restoring, or replacing that property, and tearing out and replacing any part of the building to gain access to the mold; (2) alternative living expenses; and (3) testing or monitoring of air to confirm absence, presence, or level of mold. The ACC Clause does not apply to mold covered by this additional coverage provision. Because it is uncontested that all mold damage resulted from the original toilet malfunction, which is a covered peril, any loss not covered by the Policy because of the ACC Clause is covered by the Mold Limitation. However, because Travelers has already paid out the maximum coverage, $5,000, for such losses, Jackson will not be able to recover any additional amount under this provision. Thus, the remaining issue is whether there is a genuine issue of material fact whether there are additional unpaid damages caused exclusively by water damage.

## III. Classification of Damages

Travelers argues that even if the ACC Clause does not bar any additional recovery as a matter of law, it is nevertheless entitled to summary judgment because Jackson has not established a genuine issue of material fact relating to the amount of damages still owed. Specifically, Travelers argues that while it has provided determinations and calculations establishing that it has already paid out the applicable coverage amount for all losses caused exclusively by water damage, Jackson's calculations are premised on the incorrect assumption that the efficient proximate cause standard applies and that, as a result, all damage at the House is covered regardless of whether mold contributed in some way to the loss. Because, according to Travelers, Jackson in no way accounted for mold in his analysis, as evidenced by the fact that his experts undertook no mold testing, his calculations are entirely unreliable, such that no reasonable factfinder could accept them.

Once an insurer carries its burden of establishing that certain damages are excluded from coverage, if the policyholder fails to provide sufficient evidence to allow a reasonable factfinder to "segregate covered losses from non-covered losses," summary judgment against the policyholder may be granted. *See Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir. 2004). In *Fiess*, after suffering flood damage at home, a policyholder discovered that the home was contaminated with pre-existing mold. *Id.* at 804. Because the policy did not cover flood damage, only the damages caused by the pre-existing mold were covered. *Id.* at 804-05. The policyholder offered expert testimony that 70 percent of the mold was attributable to non-flood water damage arising from leaks in the roof and windows that caused mold in parts of the house above the flood line. *Id.* at 808. The court ruled that summary judgment against the policyholder was inappropriate because, although the evidence would not allow a jury to "flawlessly segregate" between covered and excluded damages, the policyholder had provided a "reasonable basis" upon which the jury could allocate damages. *Id.*

Here, Travelers argues that its process of creating three separate estimates—one for water mitigation services, one for structural repair and rebuilding necessitated by water damage, and one for mold-related damages subject to the $5,000 limit—satisfies its burden of proving exclusion from coverage. Travelers further asserts that Jackson has not provided any allocation of damages between those caused exclusively by water, and thus covered, and those caused in part by mold, which are not covered except by the already exhausted $5,000 Mold Limitation.

Although Travelers claims that Jackson's expert witnesses ignored mold and simply concluded that, based on the efficient proximate cause standard that does not account for the ACC Clause, the record reflects that Travelers' experts and Jackson's experts both used similar

standards to differentiate between covered and excluded damages, but reached different conclusions in estimating the amount of covered damages.

## A.    Damages Standard

As discussed above, Travelers' estimators generally took the approach that loss caused exclusively by water was covered under the Policy, regardless of the presence of any mold that had no impact on the need to replace the item. *See supra* part II.B. For example, they determined that if water alone caused drywall to become unusable, it was covered under the Policy as water damage, because "it doesn't matter if it's got mold on it or not, it's going to get ripped out and thrown away." J.R. 964.

The depositions and expert reports of Jackson's damage remediation and estimating experts, William Begal and Anabel Fink of Begal Enterprises, reveal that they generally applied classification standards similar to those applied by Travelers' estimators. Noting that she did not take the position that "all of the mold loss should have been covered," Fink stated that she considered damage to an item to be caused by water damage if the item was "deficient prior to the mold" in that it was "no longer viable" regardless of whether there was mold on it or not." J.R. 667. Begal focused on the structural integrity of materials, stating that as to drywall, if it remained wet for a sufficient period of time such that "the structural integrity of the drywall is no longer intact," it should be classified as water damage, even if mold later appeared on those items. J.R. 594. Importantly, the fact that Jackson submitted only estimates of loss caused by water damage does not mean that his experts used the wrong standard because, as Fink stated, they did not include on the list items that were damaged by mold. Thus, although Jackson's experts itemized only items they deemed to be the subject of water damage, the evidence supports the conclusion, as asserted by Jackson's counsel at the hearing, that they conducted an analysis that excluded from

their estimates items where the loss was caused by mold damage. Because there is, at a minimum, a genuine issue of material fact whether Jackson's damage estimates were based on an appropriate methodology consistent with the Court's interpretation of the contract, summary judgment is not warranted based on the lack of any reasonable means by which the jury could "segregate" between covered and excluded damages. *Fiess*, 392 F.3d at 807-08.

## B. Specific Classifications of Damages

Although the parties applied similar methodologies, they reached different conclusions on the classification of specific loss items. Travelers puts forward three estimates classifying the damages as either covered water damages or capped mold damages. Jackson provided one estimate, in which he listed only items for which the loss was deemed caused by water damage. In fact, there were inconsistencies in classifications not only between the experts for both parties, but even among Travelers' own experts. Huzzy acknowledged the subjective nature of the classification process, stating that two different experts can have a difference of opinion on whether a certain item must be replaced as a result of water damage only, or as a result of mold damage. For example, Huzzy asserted that ESI, Travelers' hygienist contractor, included certain items as requiring replacement due to water damage that Huzzy did not consider to be sufficiently damaged to require removal. Notably, Travelers' categorization of items changed over time, with some recategorization of items in favor of coverage.

Where the classification determinations by Jackson's experts differed from those made by Travelers' experts, there is a genuine issue of material fact on the extent and amount of the covered loss. Contrary to Travelers' suggestion that Jackson's estimate is inherently unreasonable because it classified all damages as water, Jackson provided evidence to show a deliberative, subjective process, applying a standard similar to that employed by Travelers' experts, that simply reached

different conclusions. Fink testified in her deposition that she and Begal determined whether an item was "damaged by the water or by the mold or by the subsequent mold," but then only itemized the covered water damages and not the mold damages, such that all items on the list relate to water damage. Cameron's estimate calls for removal of damaged drywall only up to four feet up the wall, excluding the portion above the level of the toilet or the flood line on the main level, above which any damage would likely be caused by mold.

As one example of differing conclusions between the parties, Cameron called for the removal of all porous materials in the basement, even those above the water line, because he concluded that the condensation from the flowing water caused the damage. Specifically, he recommended that "drywall in ceilings outside" of the area where the ceiling collapsed, "[d]rywall higher than" the water line, and drywall "in the office further away" from the flood all be removed and covered by the Policy as caused by condensation from the water. J.R. 515. Although Merritt, on behalf of Travelers, concluded that the same damage should be categorized as caused by mold, the difference amounts to a factual dispute between experts that should be resolved by the factfinder. Thus, Jackson's list provides sufficient evidence to allow a reasonable jury to "segregate covered losses from non-covered losses" and thus creates a genuine issue of material fact. *See Fiess*, 392 F.3d at 807-08.

The fact that Jackson's experts did not test for mold does not alter this conclusion. Although the EFI Global team hired by Jackson, which conducted the first hygienist inspection of the home, did not test for mold or provide a full mold remediation protocol, that omission would primarily preclude an assessment of the cost of mold remediation. It would not necessarily prevent other experts from assessing whether particular items were a total loss as a result of water damage, with or without the presence of mold.

Certainly, the Jackson experts' limited attention to mold may be considered by the factfinder in determining which set of classifications to accept. However, viewing the record in a light most favorable to Jackson, a reasonable juror could segregate the damages differently than Travelers, such that summary judgment is not warranted.

## IV. Calculation of Damages

In addition to a genuine issue of material fact relating to the classification of damaged items, the Court also finds a genuine dispute of fact relating to the specific calculations of damages relating to items for which the parties agree coverage exists. Indeed, at the hearing, Travelers acknowledged that at this stage of the analysis, there remain factual disputes not appropriately resolved on summary judgment.

The record reflects that the parties' expert witnesses disagree on factual matters such as what type and size of equipment, and what quantity of supplies and number of personnel, are required to complete certain work to address water damage deemed to be covered under the Policy. For example, Huzzy, on behalf of Travelers, and Cameron, on behalf of Jackson, differ on the price list used to complete their estimates. Huzzy used a list from October 2014, the month the loss occurred; Cameron used a list from June 2016, the month he first inspected the property, which results in higher estimates due to price changes over time. Huzzy has identified other discrepancies with Cameron's calculations, including that he disputes Cameron's position that 15 dehumidifiers are needed and that commercial dehumidifiers, rather than residential grade ones, are needed. Huzzy also claims that there was no need for Cameron to charge for respirators in a separate line item because one was already included in a line item for a Tyvek suit. Though Huzzy believes that these and other calculations for the cost of certain line items are unreasonable, "excessive," and "inflated," J.R. 835-36, these are factual disputes not appropriately resolved on summary

judgment. For example, it is not necessarily unreasonable to conclude that additional respirators may be needed because Cameron foresaw other tasks which require a respirator, as Huzzy acknowledges that "[y]ou can have tasks where you just need a respirator." J.R. 836. Thus, even if focused only on the calculations of damages on items for which the parties agree that coverage exists, there are genuine disputes of material fact on various line items that preclude summary judgment.

## V.     Failure to Fulfill Contractual Duties

Travelers also seeks summary judgment on the grounds that Jackson's breach of contract claim must fail because he did not comply with his contractual duties under the Policy. The Policy requires that, after a loss, Jackson must "protect the property from further damage," "make reasonable and necessary repairs to protect the property," and "as often as [Travelers] reasonably require . . . show the damaged property." J.R. 34. According to Travelers, Jackson failed to make "significant efforts to protect the property from further damage" because, as of January 2018, no significant mold remediation had been completed. Mot. Summ. J. at 26. Travelers further asserts that Jackson "refused all access to his Property for 109 days" while he awaited a resolution of his MIA claim. *Id.* Travelers' log notes reflect that the period of exclusion began December 29, 2014 and ended by March 13, 2015, when Travelers received notice they would be allowed to enter once again, for a total of 75 days. J.R. 63-64, 68. Travelers argues that such non-compliance precludes this lawsuit seeking recovery of any remaining unpaid losses because the Policy provides that "no action shall be brought" against Travelers "unless there has been compliance with the policy provisions." J.R. 36.

Jackson, however, argues that the noncompliance issue is not as straightforward as Travelers presents. As evidence of his compliance with his duties under the Policy, Jackson asserts

that, upon discovering the damage, he "worked frantically" to try and remediate by vacuuming water, using towels and fans, running humidifiers, and more. J.R. 361. He hired multiple companies to create remediation and repair reports and estimates but could not afford to front the costs for remediation and repair on his own. According to Jackson, the very existence of this litigation, and not his lack of reasonable effort, is what has prevented him from fully remediating and repairing the property.

As for Jackson's refusal to allow Travelers to access the House for a period of time, whether Jackson was justified in doing so, and thus did not violate his duties, depends on the resolution of factual disputes about the sequence of events and the reasonableness of Travelers' numerous requests for entry not properly resolved in summary judgment. Notably, when Travelers sent a reservation of rights letter to Jackson, not included in the record but presumably informing him that it considered his actions to violate the Policy and preclude suit, Jackson then permitted access just four days later.

These issues are factual disputes ordinarily best left to a factfinder. Viewing the facts in the light most favorable to Jackson, as is required at this stage, the Court finds that a reasonable juror could find that Jackson complied to the best of his ability with his duty to protect the House from further damage and that Travelers was not unjustifiably denied reasonable access to the House to conduct necessary activities. The Court will therefore deny summary judgment on this issue.

## VI.    Good Faith

Travelers further argues that it is entitled to summary judgment on Jackson's claim that Travelers failed to adjust his claim in good faith, in violation of section 3-1701 of the Courts and Judicial Proceedings Article of the Maryland Code and section 27-1001 of the Insurance Article.

These provisions require the insurer to act in good faith in deciding insurance coverage, defined as making "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." Md. Code Ann., Ins. § 27-1001(a). The statute provides that recovery is available "if the trier of fact . . . finds in favor of the insured *and* finds that the insurer failed to act in good faith." Md. Code Ann., Cts. & Jud. Proc. § 3-1701(e) (West 2011) (emphasis added). To enforce this requirement, a policyholder must first file a complaint alleging a lack of good faith with the MIA. Md. Code Ann., Ins. § 27-1001(d). If the outcome is not satisfactory, the policyholder may then file a civil action for damages. Md. Code Ann., Cts. & Jud. Proc. § 3-1701(d).

Jackson has alleged that, from the very beginning of the claims process, Travelers failed to act in good faith because it did not investigate and evaluate his claim timely and adequately, did not advise Jackson of his rights or provide guidance, refused to pay for his retained environmental hygienist, excluded certain damages without a good faith basis, such as by increasing the damages subject to the Mold Limitation, and delayed the resolution of his claim without justification. Although there are limited facts upon which Jackson relies to show that Travelers did not provide sufficient guidance or act in a timely manner, the issues of whether coverage determinations were improperly skewed in favor of treating losses as subject to the Mold Limitation and whether Travelers acted in good faith when it withheld funds remain in dispute and, in light of the Court's denial of summary judgment on the breach of contract claim, could still be resolved in Jackson's favor. Where the record reflects that Travelers has refused to pay approximately $200,000 of Jackson's alleged damages, including a substantial amount based on its classification of the loss as mold-related, there has been substantial delay in resolving this dispute, and the issue of good faith is ordinarily a question of fact to be resolved by the factfinder, *see* Md. Code Ann., Cts. &

Jud. Proc. § 3-1701(e) ("[I]f *the trier of fact*. . . finds that the insurer failed to act in good faith, the insured may recover. . .") (emphasis added); *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 149 (Md. 2007) ("Good faith ordinarily is a question of fact for summary judgment purposes."), the Court finds that there remain genuine issues of material fact such that this issue is not properly decided at this stage of the litigation. Summary judgment on the lack of good faith claim will be denied.

## CONCLUSION

For the foregoing reasons, Travelers' Motion for Summary Judgment is DENIED. A separate Order shall issue.

Date: August 1, 2019

THEODORE D. CHUANG
United States District Judge